UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

_____

BRITNIE FINEHOUT, Conservator for         CASE NO: _____
JAYCE M. FINEHOUT, a minor,

    Plaintiff,                                          HON. _____

-vs-

UNITED STATES OF AMERICA,

    Defendant.
_____
BARRY R. CONYBEARE (P52056)
NATHANIEL HARRINGTON (P74782)
Conybeare Law Office, P.C.
Attorneys for Plaintiff
519 Main Street
St. Joseph, MI 49085
(269) 983-0561
barry@conybearelaw.com
nate@conybearelaw.com
_____

## COMPLAINT AND AFFIDAVITS OF MERIT

    Plaintiff, through her attorneys, Conybeare Law Office, P.C., states:

### NATURE OF THE CASE

    1.    This is a medical malpractice claim arising out of events occurring on April 4, 2016. On that date, Britnie Finehout (f/k/a Britnie Harris) was laboring to deliver her first child. Her labor was being managed by InterCare Community Health Network midwives, CNMs Lynette Polinder and Kathryn Sibbold, as well as InterCare OB/GYN Alissa Conklin, M.D. Despite intermittent ability to monitor the FHR and prolonged fetal decelerations occurring as early as 3:30 a.m. on April 4, Ms. Finehout's labor was allowed to continue and was, in fact, intensified with use of Pitocin. It was not until Ms. Finehout was completely dilated and ready to

1

begin pushing that CNM Sibbold contacted Dr. Conklin, requesting that she come to the hospital to be present during pushing due to variable category 2 fetal heart tracings. Dr. Conklin allowed Ms. Finehout to continue pushing to deliver her child until the point in time FHR dropped to 70. At that point, Dr. Conklin made the decision to perform an emergent c-section. Jayce M. Finehout was delivered at 11:54 a.m. on April 4 with Apgars of 1 at one minute, 1 at five minutes and 6 at ten minutes. He was transferred to DeVos Children's Hospital and underwent therapeutic hypothermia for his hypoxic ischemic encephalopathy. The injuries sustained and those that will be developed by Jayce M. Finehout are all a direct consequence of the negligence of CNM Polinder, CNM Sibbold and Dr. Conklin. The United States of America is liable under the FTCA because CNMs Polinder and Sibbold and Dr. Conklin were all employed by InterCare Community Health Network, a federally qualified health center.

## PLAINTIFF

2. Britnie Finehout (Ms. Finehout) was appointed conservator for her minor son, Jayce Michael Finehout, on June 30, 2020, pursuant to Order of the Berrien County Probate Court.

3. As conservator, Ms. Finehout is authorized and empowered to pursue all claims on behalf of her minor son.

4. At the time of the events giving rise to this claim, Ms. Finehout and the minor, Jayce M. Finehout, were and continue to be, residents of Berrien County, Michigan.

5. Pursuant to MCL 600.2912d, attached are plaintiff's Affidavits of Merit of Pamela Hetrick, CNM (Exhibit 1) and Paul K. Rosenberg, D.O. (Exhibit 2).

**DEFENDANT**

6. Defendant United States of America includes the U.S. Department of Health and Human Services (DHHS), InterCare Community Health Network (InterCare), and its employees, Lynette Polinder, CNM, Kathryn Sibbold, CNM and Alissa Conklin, M.D.

7. DHHS is an authorized federal agency of Defendant United States of America.

8. At all times pertinent to this Complaint, InterCare was a corporation organized under the laws of the State of Michigan, located and doing business in Berrien County, Michigan. At all times pertinent to this Complaint, InterCare was a Federally Qualified Health Center pursuant to 42 USC §254b and §233(g)-(n), operating under the DHHS.

9. InterCare, at all times relevant to the allegations of this Complaint, operated a health care facility and held itself open for prenatal and obstetrical care and treatment of the general public, including Britnie Finehout and her unborn child.

10. At all times relevant to the allegations of this Complaint, InterCare represented and held out to the public, including to Ms. Finehout and her unborn child, that it employed and maintained on its staff, skilled and competent personnel, including certified nurse midwives and obstetrical physicians.

11. CNM Lynette Polinder (CNM Polinder) is a certified nurse midwife licensed to practice in the State of Michigan who, at all times relevant to the allegations of this Complaint, practiced in Berrien County, Michigan. At all times relevant to the allegations of this Complaint, CNM Polinder practiced as a certified nurse midwife, rendering pre- and post-natal care and delivering infants, and held herself out as a competent specialist in that field.

12. At all times pertinent, CNM Polinder was an employee of InterCare.

13. At all times relevant to this Complaint, CNM Polinder acted as the actual or apparent agent of InterCare, and therefore the United States of America is vicariously responsible for her professional negligence/malpractice as set forth in this Complaint. At all times relevant to this Complaint, CNM Polinder acted within the scope of her employment/agency in the context of a physician-patient relationship.

14. CNM Kathryn Sibbold (CNM Sibbold) is a certified nurse midwife licensed to practice in the State of Michigan who, at all times relevant to the allegations of this Complaint, practiced in Berrien County, Michigan. At all times relevant to the allegations of this Complaint, CNM Sibbold practiced as a certified nurse midwife, rendering pre- and post-natal care and delivering infants, and held herself out as a competent specialist in that field.

15. At all times pertinent to this Complaint, CNM Sibbold was an employee of InterCare.

16. At all times relevant to this Complaint, CNM Sibbold acted as the actual or apparent agent of InterCare, and therefore the United States of America is vicariously responsible for her professional negligence/malpractice as set forth in this Complaint. At all times relevant to this Complaint, CNM Sibbold acted within the scope of her employment/agency in the context of a physician-patient relationship.

17. Alissa Conklin, M.D. (Dr. Conklin) is a physician, board certified in obstetrics and gynecology, licensed to practice in the State of Michigan who, at all times relevant to the allegations of this Complaint, practiced in Berrien County, Michigan. At all times relevant to the

allegations of this Complaint, Dr. Conklin practiced as an OB/GYN, rendering pre- and post-natal care and delivering infants, and held herself out as a competent specialist in that field.

18. At all times pertinent to this Complaint, Dr. Conklin was an employee of InterCare.

19. At all times relevant to this Complaint, Dr. Conklin acted as the actual or apparent agent of InterCare, and therefore the United States of America is vicariously responsible for her professional negligence/malpractice as set forth in this Complaint. At all times relevant to this Complaint, Dr. Conklin acted within the scope of her employment/agency in the context of a physician-patient relationship.

## JURISDICTION AND VENUE

20. The amount in controversy exceeds $75,000.00, excluding costs, interest and attorney fees.

21. Plaintiff properly presented Administrative Tort Claims (Tort Claims) for medical negligence to the DHHS pursuant to 28 USC §2675 via overnight UPS mail on March 22, 2018. (Exhibit 3).

22. In a letter dated March 29, 2018, the DHHS acknowledged receipt of the Tort Claims on March 26, 2018 and acknowledged that the Tort Claims had been filed with the appropriate federal agency. (Exhibit 4).

23. By letter dated July 2, 2018, the DHHS denied plaintiff's claim. (Exhibit 5).

24. Plaintiff properly presented the DHHS with a request for redetermination via overnight UPS mail on December 17, 2018. (Exhibit 6).

5

25. In its letter dated February 20, 2020, the DHHS again acknowledged receipt of plaintiff's Tort Claims, the request for redetermination, and again denied plaintiff's claim. (Exhibit 7).

26. The cause of action pled in this Complaint is the same as contained in the Tort Claims.

27. Pursuant to 28 USC §1346(b) and §2675, a Tort Claim administratively denied may be presented to a United States District Court for judicial determination.

28. The United States of America has waived governmental immunity and consented to this lawsuit by the enactment of 28 USC §1346(b).

29. This Court has jurisdiction over the defendant pursuant to 28 USC §1346(b).

30. Venue is proper in the Western District of Michigan because all of the events giving rise to the action took place in Berrien County, Michigan.

## FACTUAL ALLEGATIONS

31. Ms. Finehout arrived at Lakeland St. Joseph's L&D at 10:22 p.m. on April 3, 2016, with complaints of "continuous contractions." SVE was performed and identified as "3-4/70%/-2 with bulgy membranes." She was admitted.

32. On April 4, at 2:14 a.m., CNM Polinder evaluated Ms. Finehout. She noted the history of obesity, kidney stones, fall down the stairs, and pre-term contractions at 35 weeks. Another SVE was performed at 2:15 a.m. by an RN and identified 4/90%/-3. Bishop Score was "8." CNM Polinder's "assessment/plan" concluded:

   a. FHR Category I
   b. Pain-severe. Pt received fentanyl and Phenergan for pain at 2315, and a labor epidural around 1:45 a.m.
   c. Nutrition Plans: breastfeeding
   d. GBS negative
   e. Will reassess in 4 hours or PRN.

6

33. At 7:39 a.m., CNM Polinder returned. SVE was performed and identified 4/80%/-3. Bag of water bulging. CNM Polinder noted fetal heart baseline "140's, variability moderate, negative accels, negative decels, and that "between 3:30-3:35 a.m. patient had a prolonged 4-minute deceleration prior to Pitocin being started." CNM Polinder's birth management plan consisted of:

> Comfortable with epidural. Started Pitocin at 0455 am because patient had made no cervical change since the last exam at 2:15. Patient still has made no change at 7:42 with Pitocin running for the last 2 hours and 50 minutes. May give the patient the option of turning off the epidural and letting her go home, or continuing with augmentation with Pitocin until the head comes lower in the pelvis and we can safely break the BOW;
>
> Continue to change positions every hour
> Continue continuous fetal monitoring
> Continue GBS prophylaxis per protocol
> Reassess in 4 hours or PRN
> Anticipate NSVB

34. Following this evaluation, CNM Polinder appears to have gone off duty. The new CNM assuming Ms. Finehout's care was Kathryn Sibbold.

35. At 7:40 a.m., RN J. Soper charted "very difficult to trace UC's at times due to maternal obesity and maternal position. UC's palpate mild and abdomen palpates soft and non-tender at rest."

36. At 10:00 a.m., SROM occurred. Amniotic fluid was described as clear, no traces of meconium. Another nursing note is charted at 10:00 a.m. identifying "difficult to pick up contractions due to maternal obesity. Appear to be every 3-4 minutes."

37. At 10:06 a.m., CNM Sibbold arrived to evaluate Ms. Finehout. She noted the oxytocin rate of "5 mU/min." SVE identified 7-8/90%/0 and Ms. Finehout's cervix was described as soft. Fetal heart rate was 145 baseline, moderate variability, positive accelerations,

positive occasional variable decelerations. Another "possible" prolonged decel occurred at 8:25 with "broken tracing." CNM Sibbold also identified "difficult to pick up contractions due to maternal obesity. Appear to be 3-4 minutes." Sibbold's Assessment/Plan identified:

i. 20 y/o G1P0 at 39w6d: active labor, AROM with clear fluid at 10:00
ii. FHR status: Cat 2
iii. GBS negative
iv. Anticipate NSVD

38. At 10:30 a.m., charting on the flow sheet identifies "decels" in the fetal heart rate and that Ms. Finehout was feeling lots of pressure.

39. By 10:36 a.m., the flow sheet identifies Ms. Finehout was complete, and by 10:48 a.m., she was pushing with contractions and CNM Sibbold was at bedside.

40. At 10:44 a.m., CNM Sibbold prepared a progress note identifying:

Assessment/Plan:
i. . . . active labor
ii. FHT category 2
iii. GBS negative
iv. Will start pushing. Dr. Conklin notified of category 2 fetal heart tracing and SVE. Asked to come to the hospital to be present during pushing due to variable decels.

41. Dr. Alissa Conklin prepared an "attestation" to CNM Sibbold's progress note which confirmed:

> I discussed this patient's presenting complaint, her history and exam and the midwife's assessment. I agree with her management plan as stated above. I was present in hospital at time patient began pushing.

42. A nursing note was charted by RN Soper at 11:23 a.m. identifying "Dr. Conklin at pt bedside. K Sibbold CNM and this RN all in constant attendance at pt bedside."

43. The surgical record identifies Ms. Finehout arrived in the OR and c-section prep started at 11:45 a.m. C-section commenced at 11:51 a.m. and Jayce was delivered at 11:54 a.m. Dr. Conklin's Operative Note identifies in part:

8

Indications: Non-reassuring fetal heart tones. This 20-year old G1P0 at 39w6d was noted to be pushing with variable decels with contractions which resolved to baseline. She was complete at 1037, FSE placed at 1137, the approximately 15 minutes preceding FSE placement there was intermittent fetal tracing due to pushing and position changes.

At time of FSE placement, FHR in 70's with no recovery with scalp stimulation or 3 position changes (left, right, hands and knees). Four minutes into FSE placement, decision made for STAT section, baby born 13 minutes later.

* * *

Delivered from LOA presentation with a loose nuchal cord which was reduced prior to fetal head delivery was an 8 lb 1 oz baby boy with Apgar scores of 1 at one minute, 1 at five minutes and 6 at 10 minutes. After the umbilical cord was doubly clamped and cut between the clamps, a segment of cord was obtained for cord gases and cord blood was obtained for evaluation. The placenta was removed intact manually and appeared normal.

* * *

Final Diagnoses:
    Abnormality in fetal heart rate and rhythm complicating labor and delivery
    Obesity complicating child birth
    Anemia complicating child birth
    Acute post-hemorrhagic anemia
    39 weeks gestation of pregnancy
    Single live birth

Cord gas values from a draw on April 4 at 12:00 noon identified:
    pH:    <6.92 PH Units
    PC02: >125 mm[Hg]
    02:    24 mm[Hg]
    02 Sat: 25.7%

44. Pathology on the placenta identified:

Comment: Sections of the placenta show villous morphology consistent with the gestational age. Acute chorioamnionitis and acute funisitis are present. These are associated with increased perinatal morbidity including fetal distress. Focal villous hypervascularity is noted and is suggestive of prolonged placental hypoxia. Maternal surface hemorrhage is present. Clinical correlation is suggested. Occasional basal decidual vessels showed persistent muscularization, an indication of placental malperfusion, which is associated with retroplacental hemorrhage and may also be associated with fetal growth restriction and other adverse outcomes.

9

45. At birth, Jayce had no respiratory effort. He was pale and hypotonic. Resuscitation efforts commenced immediately, including chest compressions and initiation of PPV. Pediatrician, Dr. Desire Anderson, arrived at 12:00 noon and shortly thereafter Jayce was intubated. Resuscitation continued and finally at 12:06 a.m., 12 minutes after birth, Jayce was exhibiting spontaneous respirations. By 12:15 a.m., he had passed meconium and at 12:49 a.m., Jayce was transferred from the OR to the nursery and hooked to monitors. By 2:03 p.m., the decision was made to transfer Jayce to DeVos Children's Hospital for head cooling therapy. The DeVos transfer team arrived at 2:51 a.m. and at 5:30 p.m. left Lakeland with Jayce. The Lakeland Discharge Summary identifies:

> Complications:
>     Active Problems:
>         Term newborn delivered by c-section, current hospitalization
>         Respiratory failure requiring intubation
>         Perinatal anoxic-ischemic brain injury
>         Resolved Problems:  No resolved hospital problems
>
>                         \* \* \*
>
> In brief, patient was noted to have anoxic injury. Cooling was initiated during resuscitation which was extensive and required both chest compression and intubation. Blood gases both from cord and 1 hour after delivery showed profound acidosis.

46. Once at Devos, Jayce was placed on therapeutic hypothermia treatment beginning on April 5 through April 11. A continuing electroencephalogram was performed on Jayce between April 4 and April 8 and identified:

> Impression:  This prolonged/CCM EEG is abnormal due to mildly dysmature background, as well as excessive presence of epileptiform discharges in the right and left centro-temporal areas. This finding is suggestive of diffuse cerebral dysfunction, or encephalopathy, non-specific to etiology. One event noted during the study (apnea, without bradycardia) was not associated with epileptic activity on EEG (non-epileptic spell). Correlation with clinical symptoms and/or neuroimaging is recommended.

47.     Jayce was discharged from Helen DeVos on April 11, 2016. His parents were cautioned by DeVos care providers that Jayce was at risk for complications related to his cerebral depression sustained during his birth. Within a year of his birth, Jayce began experiencing seizure-type movements. He stopped breathing during sleep. A recent neuropsychological evaluation of Jayce identified a pattern of impairment consistent with the long-term effects of perinatal brain damage, including but not limited to, poor general intellectual functioning (Full Scale IQ of 73), degradation of visuoconstructional skills, and impaired left-hand motor skills. Jayce's impairments are likely to grow much more pronounced from his peers as he ages. Due to the brain damage and impairments, Jayce will need special education services (IEP) through high school, and will likely have limited vocational prospects and ability to support himself as an adult. The brain damage Jayce sustained during his birth will also increase his risk of seizures and emotional and behavioral problems.

## MEDICAL NEGLIGENCE

48.     At all times relevant to the allegations of this Complaint, CNM Polinder owed Ms. Finehout and her unborn child, Jayce M. Finehout, a duty to provide plaintiff with such care and treatment as would a reasonable certified nurse midwife confronted with the same or similar conditions and circumstances.

49.     CNM Polinder breached the applicable standards of care on April 4, 2016, while treating Ms. Finehout and her unborn child, when:

   a.    She failed to provide Ms. Finehout and her unborn fetus with the care as would a reasonably prudent certified nurse midwife;

   b.    Following the call from L&D nurses at 4:45 a.m., concerning a prolonged fetal deceleration, she failed to immediately:

         i.    Examine Ms. Finehout in person;
         ii.   Advise the on-call OB of the details of Ms. Finehout's labor;

      iii.      Break the bag of water (BOW);
      iv.      Place a fetal scalp electrode (FSE) and intrauterine pressure catheter (IUPC);
      v.      Not order Pitocin without consultation from the on-call OB.

   c.   Prior to CNM Polinder ordering Pitocin in the circumstances existing at 4:45 a.m., it was incumbent upon her to first place an FSE and IUPC in order to closely monitor fetal wellbeing and uterine activity secondary to the nursing report of difficulty monitoring related to maternal obesity.

   d.   Following completion of the SVE (4/80/-3) at 7:40 a.m., CNM Polinder failed to contact the on-call OB and place an FSE and IUPC as the patient had periods of tachysystole and variable decelerations prior to this exam.

   e.   She failed to give a complete report regarding Ms. Finehout's labor to CNM Sibbold at shift change to ensure maternal and fetal wellbeing during the continuation of the labor process.

50.    At all times relevant to the allegations of this Complaint, CNM Sibbold owed Ms. Finehout and her unborn child, Jayce Finehout, a duty to provide plaintiff with such care and treatment as would a reasonable certified nurse midwife confronted with the same or similar conditions and circumstances.

51.    CNM Sibbold breached the applicable standards of care on April 4, 2016, while treating Ms. Finehout and her unborn child, when:

   a.   She failed to provide Ms. Finehout and her unborn fetus with the care as would a reasonably prudent certified nurse midwife;

   b.   At approximately 10:00 a.m., upon learning of the additional prolonged deceleration occurring at 8:25 a.m., she failed to:

      i.      Advise the on-call OB of the prolonged decelerations and the recurrent late decelerations between 8:00-9:00 a.m., with periods of minimal variability;
      ii.      Place an FSE and IUPC to closely monitor fetal wellbeing;
      iii.      Reduce the Pitocin rate or discontinue it when fetal criteria indicated (tachysystole/fetal decelerations).

   c.   Between 10:57 a.m. and 11:22 a.m., the fetal heart rate monitoring dictated that CNM Sibbold should have contacted Dr. Conklin and requested that she evaluate Ms. Finehout in person and likely take over the management of the labor. The

     Pitocin infusion should have been discontinued during this period of time secondary to the fetal heart rate decelerations and expedited delivery of Jayce should have occurred.

52. Dr. Conklin breached the applicable standards of care on April 4, 2016, while treating Ms. Finehout and her unborn child, when she:

 a. Failed to provide Ms. Finehout and her unborn fetus with the care as would a reasonably prudent OB/GYN;

 b. Failed to appropriately elicit information, evaluate, diagnose, and treat Ms. Finehout and her unborn fetus;

 c. Received a report from CNM Sibbold at 10:44 a.m., on April 4, 2016, and she failed to:

  i. Evaluate Ms. Finehout and her unborn child, in person,
  ii. Stop the administration of Pitocin,
  iii. Take over management of the labor, and
  iv. Perform a cesarean section as quickly as it could be arranged.

53. As a/the direct and proximate result of the deviations from the standards of care set forth above, Jayce Finehout suffered severe fetal compromise, hypoxic-ischemic encephalopathy (HIE), profound acidosis, seizure disorder and developmental delay, all of which have left him with severe injuries, and neurologic deficiencies and resultant damages.

54. Plaintiff has suffered non-economic damages, including physical pain and suffering, mental anguish, fright and shock, denial of social and recreational pleasures and enjoyments, embarrassment, humiliation, mortification, disability, and permanent impairment and disfigurement, all past, present and future in nature. Plaintiff has suffered economic damages, including medical, hospital, prescriptive, equipment, and housing expenses, attendant care, lost earning capacity, lost ability to perform household services, and other miscellaneous out of pocket expense, past, present and future in nature.

55. The United States of America is vicariously liable for the professional negligence/malpractice of defendants, CNM Polinder, CNM Sibbold, Dr. Conklin and Intercare, as set forth in this Complaint under the doctrines of actual agency, apparent agency, ostensible agency, joint venture/joint enterprise liability, as well as 42 USC §2546 and 233 (g)-(n).

56. As a direct and proximate result of the negligence of defendants, plaintiff has been damaged as set forth above.

57. Neither plaintiff Britnie Finehout or Jayce Finehout were comparatively negligent in any way and did not proximately cause or contribute to Jayce's injuries or damages in any way.

WHEREFORE, plaintiff requests the Court enter judgment against the United States of America in such an amount as is determined to be fair and reasonable, together with costs, interest and attorney fees.

DATE: August 5, 2020                           CONYBEARE LAW OFFICE, P.C.

                                              BY: /s/Barry R. Conybeare
                                                  Barry R. Conybeare (P52056)
                                                  Attorney for Plaintiff
                                                  519 Main Street
                                                  St. Joseph, MI 49085
                                                  (269) 983-0561